■ In the Matter of ROSEMARY GOLIA, Appellant, v MEENAKSHI SRINIVASAN et al., Respondents. [945 NYS2d 11]—

---

Judgments, Supreme Court, New York County (Eileen A. Rakower, J.), entered December 14, 2009, denying the consolidated petitions to annul the determinations of respondent Board of Standards and Appeals (BSA), dated January 13, 2009, which denied petitioner's appeal of a determination of respondent New York City Department of Buildings (DOB), dated August 24, 2006, declining to revoke a building permit issued to respondent Thomas Carroll, and which granted respondent Carroll's appeal of a determination of DOB, dated April 27, 2007, to the extent of reinstating his building permit, and dismissing the proceedings brought pursuant to CPLR article 78, unanimously affirmed, without costs.

Petitioner and respondent Carroll are shareholder-tenants of respondent Breezy Point Cooperative, Inc., a housing cooperative located on the Rockaway Peninsula, in Queens County. Based on his shares in the co-op, Carroll has a proprietary lease entitling him to possession of the premises known as 607 Bayside Drive, the subject premises. Based on her shares, petitioner holds a proprietary lease entitling her to possession of the property known as 2 Bayside, which is adjacent to the rear of the premises. Carroll's lot existed before the passage of the 1961 Zoning Resolution. These proceedings followed the DOB's issuance of a new building permit to Carroll authorizing the construction of a new single-family residence on the premises.

"[T]he BSA is comprised of experts in land use and planning, and . . . its interpretation of the Zoning Resolution is entitled to deference. So long as its interpretation is neither irrational, unreasonable, nor inconsistent with the governing statute, it will be upheld . . . [W]hen applying its special expertise in a particular field to interpret statutory language, an agency's rational construction is entitled to deference" (*Matter of New York Botanical Garden v Board of Stds. & Appeals of City of N.Y.*, 91 NY2d 413, 418-419 [1998] [internal quotation marks omitted]; *see Matter of Brimberg v New York City Bd. of Stds. & Appeals*, 44 AD3d 413 [2007], *lv denied* 10 NY3d 710 [2008]).

BSA's reinstatement of the permit was based on a rational interpretation of the New York City Zoning Resolution (as amended) (ZR or Zoning Resolution) as applied to the subject site. For more than 40 years, the DOB had interpreted the Zoning Resolution at Breezy Point as requiring setbacks measured from the plot line. This practice derived from the unusual manner in which the Breezy Point properties are defined, with the boundaries of many plots not coincident with the edge of adjoining walkways, service lanes or streets.

The DOB's interpretation was a reasonable one in light of the unique configuration of Breezy Point, and not inconsistent with the Zoning Resolution. "Front yard" is defined in ZR § 12-10 as a "yard extending along the full length of a front lot line." "Yard" is similarly defined as "that portion of a zoning lot . . . along the entire length of a lot line, and from the lot line for a depth or width set forth in the applicable district yard regulations." "Front yard line" is defined as "a line drawn parallel to a front lot line at a distance therefrom equal to the depth of a required front yard." "Lot line" is defined as "a boundary of a zoning lot" (*id.*)

Petitioner insists that the Zoning Resolution mandates that setbacks be measured from the edge of a street. However, this interpretation of the Zoning Resolution, while not unreasonable, is not self-evident. Petitioner fails to appreciate the ambiguity in the Zoning Resolution, which arises out of the definition of a "front lot line" as a "street line," i.e., a "lot line separating a street from other land" (ZR § 12-10). Since many of the lot lines in Breezy Point fall within service roads, they do not separate the street from other land but are nonetheless lot lines, i.e., a "boundary of a zoning lot" (*id.*). It was thus reasonable for DOB to interpret the Zoning Resolution as requiring measurement of setbacks from the lot line, wherever it fell.

BSA correctly recognized, in any event, that because the permit was initially issued based on a reasonable interpretation

of the Zoning Resolution, it was valid when issued and gave Carroll a vested right to construct his home in reliance on the validity of the permit (*compare Matter of Perrotta v City of New York*, 107 AD2d 320, 325 [1985], *affd* 66 NY2d 859 [1985]; *see e.g. Village Green Condominium Corp. v Nardecchia*, 85 AD2d 692, 693 [1981] [subsequent building inspector could not properly refuse to issue a certificate of occupancy based on an interpretation of "place of public assembly" that was contrary to the rational interpretation of the building inspector who had initially issued the building permit]).

The court also correctly determined that the unanimous resolution of the BSA, issued January 13, 2009, was rational and therefore should not be disturbed. The BSA correctly determined that the Carroll lot existed "separately and individually from all other adjoining tracts of land" prior to the December 15, 1961 effective date of the Zoning Resolution, and therefore qualified as a preexisting small lot under the exemption set forth in ZR § 23-33 (b). Since Carroll's lot qualified as an "existing small lot," the proposed new construction did not violate ZR § 23-32, which requires a minimum of 3,800 square feet for a single-family detached residence in an R4 district; ZR § 23-711, which sets forth requirements for minimum distance between buildings; or ZR § 62-71, which sets forth waterfront lot certification requirements.

By letter dated April 11, 2006, the co-op certified to DOB that the Carroll plot is as it existed in 1960. The co-op provided DOB with a copy of a 1946 topographical map, along with the plot card and a survey. In addition, the co-op's general manager testified at the public hearing that the subject premises has existed as a separate, individual lot since the co-op's formation in 1960, and that there has been no subsequent reconfiguration of either the Carroll plot or petitioner's plot.

Petitioner, relying on a minor discrepancy between a plot card and a subsequent survey, asserts that the Carroll lot did not exist "separately and individually" on December 15, 1961 and the date of the application for a building permit. However, the BSA rationally determined that the survey was more reliable than the plot card, which was prepared by a person who was not a licensed surveyor, and that the survey, maps, and other evidence supported the finding that the Carroll lot existed as a separate and individual lot. The BSA's determination was consistent with the DOB's long-standing acceptance of the co-op's plots as separate zoning lots.

The BSA correctly determined that the Carroll lot was a corner lot and therefore exempt from the rear-yard require-

ments set forth in ZR § 23-47. The BSA found that the sand lane adjacent to the Carroll lot qualified as a "street" and that the street intersected with Bayside Avenue at an angle of less than 135 degrees. Based on these findings, the Carroll lot qualified as a corner lot exempt from rear-yard requirements. The BSA rationally determined that the sand lane qualified as a "street" since on December 15, 1961, it "was performing the functions usually associated with a way established on the City Map." The sand lane was depicted on a 1946 topographical map, and on the co-op's 1960 plot card. The evidence showed, inter alia, that the sand lanes provide access to homeowners and visitors to the adjacent parking area, as well as access to emergency vehicles and sanitation trucks to the surrounding homes. The general manager of the co-op testified that the sand lanes "provide the access for service vehicles, utility vehicles and also the residents to get back to their homes," noting that these lanes "must be maintained at all times" and be "open and unencumbered."

The BSA correctly rejected petitioner's contention that the sand lane was a private road since it did not appear on the City map. The BSA explained that the definition of "street" expressly contemplates ways not shown on the city map, including a way that is not expressly public. The BSA has previously determined, in other cases, that the sand lanes in Breezy Point qualify as "streets" for zoning purposes.

It was rational for the BSA to reject the report of petitioner's surveyor, since the scale of the map on which he relied was so small as to render the purported measurement of the angle of intersection with Bayside Drive "highly questionable."

The BSA rationally determined that the proposed construction did not eliminate access to a mapped street, and thus did not violate General City Law § 36. The Carroll corner lot fronts the sand lane, discussed above, and Bayside Drive, a mapped City street. Because more than 8% of the Carroll lot fronts on Bayside Drive, the construction did not violate Administrative Code of the City of New York § 27-291, which requires that at least 8% of the total perimeter of a proposed building front directly on a mapped street.

The BSA rationally determined that since the proposed construction merely maintained the preexisting noncompliance, the Carroll construction was exempt from the parking requirements set forth in ZR § 25-22, and Reference Standard 16-21 of the New York City Building Code (Administrative Code, tit 27, ch 1, Appendix) involving distance between septic tanks, foundation walls and seepage pits. In the resolution, the BSA explained

that on-site wastewater disposal systems within Breezy Point must meet the Department of Environmental Protection's standards "to the greatest extent feasible from an engineering point of view," and that the DOB was satisfied that Carroll had met such standards in connection with his replacement of the septic tank.

We have considered petitioner's remaining contentions and find them unavailing. Concur—Saxe, J.P., Sweeny, Moskowitz and Manzanet-Daniels, JJ.